Filed 4/22/15  County of Riverside v. Miller CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| COUNTY OF RIVERSIDE, | |
| Plaintiff and Appellant, | E058117 |
| v. | (Super.Ct.No. RIC1210888) |
| ANTHONY MILLER, | OPINION |
| Defendant and Respondent; | |
| JASON RAWLINGS, | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Pamela A. Thatcher,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Bent Caryl & Kroll, Sergio Bent, and Steven M. Kroll for Plaintiff and Appellant.

No appearance for Defendant and Respondent Anthony Miller.

Stone Busailah, Michael P. Stone, Muna Busailah and Robert Rabe for Real Party

in Interest and Respondent Jason Rawlings.

This action arises from plaintiff and appellant County of Riverside's (the County) June 2010 termination of employment of real party in interest and respondent Jason Rawlings as a probation corrections officer (PCO) for acts of dishonesty, inefficiency or negligence in performance of duties, neglect of duty, willful violation of an employee regulation, and conduct which adversely affects job performance. Rawlings challenged his termination through administrative arbitration, resulting in the arbitrator reversing termination and ordering that the 22 months (July 2010 through April 2012) Rawlings had been off work be recorded as an "indefinite suspension" without pay or benefits. The County brought this administrative mandamus proceeding under Code of Civil Procedure section 1094.5 to challenge an arbitrator's decision. The trial court denied the petition, upholding the arbitrator's decision, and the County appeals. We conclude the arbitrator acted within its discretion in ruling that Rawlings's conduct did not constitute a case for termination, and we affirm the judgment.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. Rawlings's Employment with the County

Rawlings was hired by the County's Probation Department (Department) in October 2002. At that time, and later on, Rawlings received, read and understood the Department's policies regarding use of force options and code of ethics, which discussed specific provisions regarding accountability, integrity, and honesty. Also, Rawlings received basic training prior to assuming his duties as a PCO, and he signed a statement acknowledging that his employment could be terminated for any acts of dishonesty, misconduct, or neglect of duties.

2

On November 21, 2009, Rawlings was employed as a PCO II assigned to Riverside Juvenile Hall, Group 3. As a PCO, he was a sworn police officer. He was aware of the use of force policy applicable to juvenile hall, acknowledged that minors should not be physically restrained in situations where control could be gained through a command presence such as "calling for a scan,"[1] and understood what must be done if he observed a use of force. Furthermore, as a PCO, Rawlings was responsible for the protection of the minors at juvenile hall, including protection from other PCO's. Thus, if he observed a coworker engaging in any use of force with a minor, Rawlings was expected to respond to the incident and call a scan. Rawlings understood he was a "mandatory reporter" for any instance of child abuse, and that he had a duty to protect minors from the use of improper force. He also understood he could be called as a witness if he observed any misconduct within the institution.

## B. Events Leading to Rawlings's Termination

### 1. The Incident

On November 21, 2009, Rawlings was working with Senior Corrections Officer Gary Johnson. About 7:41 p.m.[2] Johnson was sitting to the left of the television in the

---

[1] A "scan" is a verbal call for help. A PCO has a duty to call for a scan any time there is a fight, assault or use of physical force involving minors or staff. A scan is also known as a "supervisor call." Scan refers to the use of older technology. In the past, officers had pens that they would click which would "lead to a box and make a sharp noise . . . ." Now officers are able to radio for help. Because of older staff, the name "scan" has continued to be used when referring to a supervisor call.

[2] Actual time of day will be used; however, it should be noted that the time indicated on the video surveillance system was five minutes ahead of the actual time.

3

activity room, and Rawlings was standing in front of the bathroom door in the activity room. Rawlings was positioned to allow him to observe the minors in the activity room, the bathroom area, and the hallway leading to the bedrooms at the same time. Johnson asked minor A.S. to go to bed, and the minor responded, "I'll get there when I get there, homey," or words to that effect. Johnson stood up, walked past Rawlings, and proceeded towards the hallway where A.S. was located. Rawlings was watching over the minors in the activity room. According to the video retrieved from the hallway camera, Johnson continuously pushed A.S. down the hallway towards room 4. Approximately 10 minutes later, when Rawlings lost sight of Johnson and A.S., Rawlings walked to room 4. Upon entering the room, he observed Johnson restraining A.S. on the bed. Rawlings pepper sprayed A.S. and made a supervisor call.

### 2. Report of the Incident Involving A.S.

On November 21, 2009, Rawlings submitted his report of the incident. He stated that "Senior PCO Gary Johnson escorted minor [A.S.] . . . down the hall to room 4" and that he observed "Senior PCO Johnson counseling minor . . . in an attempt to get him to go into his room." During this time, Rawlings was supervising the minors in the dayroom; however, when he looked down the hallway again and noticed that Johnson was no longer in his (Rawlings's) view, he went down the hall to room 4, where he saw Johnson restraining A.S. on the bed while the minor was struggling to get up. Rawlings sprayed a burst of pepper spray in the minor's facial area and called a supervisor.

According to Johnson's report of the incident, A.S. became "defiant, combative, and belligerent towards staff," and Johnson wanted to get him away from the other

4

minors, and thus, he "began to escort [A.S.] down the hallway." Johnson "placed [his] hand on the top part of [A.S.'s] back, and he immediately jumped in an exaggerated motion, becoming more combative." He got behind A.S. and "placed [his] hand down by [A.S.'s] waist, guiding him towards his room." Johnson reported that he counseled A.S. at the door to the room. A.S. went inside the room, turned around, and punched Johnson in the eye. Johnson explained that he restrained A.S. for safety reasons, and Rawlings arrived and pepper sprayed A.S. in the eyes.

Supervising Probation Officer Ronald Cherkin reviewed Johnson's report and then reviewed the surveillance footage of the incident. Cherkin noted that Johnson's written report of the incident in the hallway did not accurately reflect what was shown on the tape, specifically, that Johnson repeatedly pushed A.S. down the hallway.

### 3. Administrative Investigation of the Incident

Supervising Probation Officer Sandra Rosales and Senior Probation Officer Robert A. Tyree conducted an administrative investigation of the incident between Johnson and A.S. from December 21, 2009, through February 1, 2010. The officers on duty and the minors being housed in juvenile hall group 3 were interviewed, and the surveillance video was reviewed. Following the investigation, Rosales and Tyree noted that Rawlings had omitted certain events from his incident report (i.e., the verbal exchange between A.S. and Johnson that led up to Johnson's initial contact with A.S. in the hallway) in "violation of Institutional [P]olicies 1357 (Force Options) Section E., '*Document the events leading up to the incident and outline any stabilization/de-escalation efforts, i.e., counseling verbal warning. Note why these techniques were not*

5

*successful or practical*;' and, 132.1 (Operation Expectations for Juvenile Facilities) Section V.7. '*Disregard of institutional policies, procedures, and practices*.'" (Original italics.) They opined that Rawlings "omitted these details deliberately in an effort to protect himself and Mr. Johnson and to avoid scrutiny concerning the abuse that took place in the hallway." Further, Rosales and Tyree noted Rawlings's "failure to document the contact he observed between Mr. Johnson and the minor in the hallway." They faulted Rawlings for failing to report that he had witnessed Johnson push A.S. in violation of Institutional Policy 1357, section E. They noted that Rawlings had a clear view of the hallway, the minors in the activity room heard sounds of a struggle, and the surveillance video from the activity room showed that Rawlings was looking down the hallway. Thus, they opined that Rawlings's claim that he did not see or hear a struggle between Johnson and A.S. "does not appear to be truthful."

Rosales and Tyree interviewed Rawlings on January 13, 2010. Regarding Rawlings's failure to document the events that occurred prior to his involvement, he explained that he believed they were separate incidents. Concerning Johnson pushing A.S. in the hallway, Rawlings stated "he knew the matter was being recorded and was going to be 'scrutinized on camera' and that 'everybody and their brother was [*sic*] going to be looking at it' and that it was 'not going to get by anybody.'"

Rosales and Tyree expressed concern about Rawlings's claim that he only lost sight of Johnson and A.S. for less than a minute before Rawlings responded by going to room 4. According to the investigators, the surveillance video from the hallway shows that nearly 10 minutes elapsed between the time Johnson and A.S. reached the end of the

hallway and Rawlings responded. Thus, Rosales and Tyree were concerned about the actual length of time Johnson and A.S. were out of sight and why Rawlings failed to act. They viewed Rawlings's omissions in his incident report as lacking "truthfulness in the performance of his duties" and warranting discipline.

## C. Rawlings's Termination

On May 28, 2010, the County sent a Notice of Proposed Termination to Rawlings. The reasons stated in the notice were: (a) dishonesty; (b) inefficiency or negligence in the performance of duties; (c) neglect of duty; (d) willful violation of an employee regulation prescribed by the Board of Supervisors or the head of the department which the employee is employed; and (e) conduct either during or outside of duty hours which adversely affects the employee's job performance or operation of the department in which they are employed. Rawlings was terminated effective June 14, 2010.

## D. Arbitration Proceeding

Rawlings appealed the County's disciplinary action, and a hearing officer was selected by mutual agreement of the parties under the terms and conditions of the collective bargaining agreement. At the arbitration hearing conducted on October 13 and 18, 2011, both parties were given the opportunity to present evidence in the form of exhibits and testimony of witnesses, who were duly sworn and available for cross-examination. The parties were also given the opportunity to object to the admission of evidence, make an opening statement, and file a closing brief.

The County's justification for terminating Rawlings's employment was based on his alleged failure to report what had occurred prior to pepper spraying A.S. The County

7

presented the testimony of Cherkin, who described the policies and procedures that probation correction officers must follow at juvenile hall. Cherkin also stated that during monthly staff meetings he reviewed the force options policy with the officers, who would "sign off" to indicate they had "read it and that they under[stood] it." As the surveillance videos played, Cherkin described what was happening. According to Cherkin, Rawlings's report should have started "from the time [A.S.] was being sent to a room . . . ." Furthermore, Cherkin opined that Rawlings "should have called a scan" when he first witnessed Johnson push A.S., because the push constituted a use of force. On cross-examination, Rawlings's counsel confirmed that Cherkin was not present to observe the incident between Johnson and A.S; rather, Cherkin's only knowledge of the incident was based on his review of the videos and incident reports. Cherkin admitted there is no testing of the officers as to their understanding of the use of force policy. Regarding the activity room video, Cherkin "could not tell where Mr. Rawlings was looking at any point in time."

The County also presented the testimony of Assistant Chief Probation Officer Mark Hake, who conducted the *Skelly*[3] hearing with respect to Rawlings's discipline. Hake testified that he agreed with the County's disciplinary action towards Rawlings, because he found Rawlings to be dishonest and "dishonesty alone was enough to support the termination."

---

[3] *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.

Rawlings presented the testimony of two probation corrections officers who rated his level of honesty as a 10 on a scale of 1 to 10, 10 being most honest. Rawlings also testified about his training and his observation of the incident between Johnson and A.S. He stated he was never tested in any manner as to his understanding of the force options policy. Regarding witnessing an officer with his or her hands on a minor, Rawlings explained that he may or may not include it in an incident report, depending on the situation. Regarding the incident in question, Rawlings testified that he briefly looked down the hallway because his primary focus was on the minors in the activity room. He stated that his purpose of looking down the hallway was to make sure both Johnson and A.S. remained in sight. Rawlings testified that when Johnson was approximately 24 to 25 feet from Rawlings, he saw Johnson push A.S. He denied seeing more than one push and he did not believe the push was an improper use of force, because Johnson was the "use-of-force instructor" whose action he did not question. Rawlings acknowledged that he did not mention the push in his report because (1) he assumed that Johnson would report his own actions towards A.S. in his (Johnson's) incident report, and (2) he relied on the video surveillance to provide further information. According to Rawlings, what he saw may have been considered force, but not excessive force.

Rawlings admitted that he had a very high regard for Johnson and described him as "'the man.'" Rawlings testified that as Johnson and A.S. moved down the hallway, Rawlings "occasionally" looked towards Johnson while focusing on the "20-plus kids" in the activity room. He stated that when the other minors started to say something, he

9

looked towards the hallway again and "it appeared that the minor was walking backwards and Johnson was walking forwards, and so they're going down the hall."

According to Rawlings's testimony, approximately 10 minutes after Johnson's initial contact with A.S., Rawlings lost sight of the two and walked down the hallway to room 4. Rawlings stated he observed A.S. lying backwards on the bed with Johnson restraining him; Rawlings reached for his pepper spray, and he made a scan call. He explained that he called for a scan because he "saw the use of force." He admitted briefly pepper spraying A.S. in the face.

The surveillance videos were played at the arbitration and have been reviewed on appeal. Like the arbitrator, we note it is unclear how many times Rawlings looked down the hallway and the length of each time. Further, we note that from Rawlings's viewpoint, he was able to see only the back of Johnson as Johnson was walking with A.S. down the hallway. According to the video, Johnson appears bigger than A.S. The hallway video does not show the door to room 4 in order to determine if Johnson and/or A.S. are inside or outside the room during the time when Johnson is counseling A.S.

### E. Arbitrator's Opinion and Award

In submitting the matter to the arbitrator, Anthony Miller, the parties stipulated to the following issues: "1. Was the termination for just cause? [¶] 2. If not, what is the appropriate remedy?" Miller issued a final opinion and award on April 29, 2012. While Miller was unable to conclude that Rawlings engaged in an act of dishonesty, he did conclude there was a "significant violation of policy." More specifically, Miller found that the videos failed to conclusively show that Rawlings saw the events in the hallway.

10

Miller observed that even if Rawlings did look down the hallway, it is "impossible to tell what he saw." Noting the presence of PCO Amanda Nelson in the area of the hall, between Rawlings and Johnson, Miller commented that Nelson's claim that Rawlings had a visual of Johnson failed to state at what point Rawlings had such visual. Miller described Johnson's pushing A.S. as being intermittent such that it was "impossible to tie any of the small and blurry glances with any particular push." Miller points out the hall video clearly shows that Johnson's back was to Rawlings at all times and Johnson was between Rawlings and A.S. Miller found that it "simply may not have been possible for [Rawlings] to see exactly what was going on even if he looked at exactly the right time." Thus, Miller concluded the only credible evidence as to what Rawlings saw was Rawlings's own admission to seeing a "kinda like a push" by Johnson. However, Miller found that, pursuant to the County's policies, Rawlings should have reported all of the events from the moment he witnessed Johnson place his hands on A.S.

Regarding the disciplinary action taken against Rawlings, Miller noted that progressive discipline is inherent in the just cause standard because it "insures that the employee knows that his or her conduct is wrong or at least not allowed, that the employee has had a chance to mend his or her ways, and, in a sense, because the employee has had this opportunity, that it is fair to dismiss the employee." However, Miller pointed out there is no evidence that Rawlings "was ever disciplined at any level for the failure to report a use of force, for the failure to properly fill out a report or for dishonesty." While Miller was "convinced . . . that dishonesty and willful misrepresentation regarding the use of force in the setting of law enforcement and

11

correctional duties" may justify summary dismissal, he opined that "for the charge of dishonesty, there must be some additional mental element" such as "an intent to deceive."

After conducting a de novo review, Miller "concluded that the requisite mental element for dishonesty is not present," and he was "unwilling to infer this element." Although Rawlings did not use the word "push" in his incident report, Miller declined to "infer intent to deceive" from such omission, and concluded that such omission was insufficient "to base the decision to discharge a ten year employee with no previous discipline on the record, and with no prior discipline for omitting information from reports." To further support his decision, Miller explained the only truly incriminating evidence was from Rawlings's own admission during the investigation: Rawlings's honesty during the investigation "undercut . . . the conclusion that he intended to deceive." Nonetheless, Miller recognized that Rawlings was "careless and negligent" in fulfilling his duty to fully report the incident involving Johnson and A.S. and viewed such conduct as a "serious breach of departmental policy."

Rejecting summary dismissal, Miller reinstated Rawlings to the position Rawlings had at the time of his discharge, and reduced his discipline to 22 months' suspension, time served, without pay or benefits.

### F. Administrative Mandamus Proceeding

On July 13, 2012, the County brought the present proceeding in superior court, seeking a writ of mandate compelling the arbitrator to set aside his decision and sustain Rawlings's termination. On December 10, 2012, the court entered judgment denying the peremptory writ of mandate. The court ruled the arbitrator's decision was supported by

12

substantial evidence, and that he did not act arbitrarily or abuse his discretion in ordering Rawlings's reinstatement to his position of Deputy Probation Corrections Officer II without back pay.

## II. DISCUSSION

### A. Standard of Review

With respect to the issue of whether Rawlings committed the misconduct alleged against him, we review the record to determine whether substantial evidence supports the trial court's conclusions. "The trial court applies its independent judgment to [an agency's] administrative decision, but with a strong presumption the department acted properly. (Code Civ. Proc., § 1094.5, subd. (c) . . . .) We review the trial court's factual findings for substantial evidence. [Citation.] We independently review the court's legal findings. [Citation.]" (*Chrisman v. City of Los Angeles* (2007) 155 Cal.App.4th 29, 33.) When the matter involves the level of discipline imposed, "[j]udicial review of an agency's assessment of a penalty is limited, and the agency's determination will not be disturbed in mandamus proceedings unless there is an arbitrary, capricious or patently abusive exercise of discretion by the agency. [Citation.]" (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279.)

### B. Propriety of Termination

The County contends the arbitrator abused its discretion in finding insufficient just cause for Rawlings's termination. More specifically, it challenges the arbitrator's finding that Rawlings was not dishonest. Giving due deference to the arbitrator's decision, we reject the County's contention and challenge.

13

*1. Dishonesty*

A public employee's acts of moral turpitude may be so extreme that dismissal is appropriate. Dishonesty constitutes cause for discipline of a state employee under both Government Code section 19572, subdivision (f), and the County's disciplinary regulations. Cases under Government Code section 19572 have defined "dishonesty" as connoting "a disposition to deceive. [Citation.] It '"denotes an absence of integrity; a disposition to cheat, deceive, or defraud; . . ."' [Citation.]" (*Gee v. California State Personnel Board* (1970) 5 Cal.App.3d 713, 718-719.)

Here, the arbitrator observed, "There is no direct evidence of an intent to deceive; this intent must be inferred from the facts. There is no evidence of a conspiracy, there is no evidence that [Rawlings] changed the report at the behest of anyone else; there is no confession of intent; there is no history of this kind of misrepresentation or of any other dishonesty for that matter." Reviewing Rawlings's incident report, we agree. According to his report, Rawlings, in relevant part, stated that "Senior PCO Johnson *escorted* minor . . . down the hall to room 4. This writer observed Senior PCO Johnson *counseling* minor . . . in an attempt to get him to go into his room." (Italics added.)

Rawlings was interviewed about the contents of his incident report. He maintained that A.S. was not physically challenging or violent during the day in question. When Johnson instructed the minor to go to bed, Rawlings stated he heard the minor respond "to the effect oh-like I'll get there right when I get there homie, don't . . . stress me or something." Johnson remained seated. As the minor entered the hallway, he stopped, turned around, and addressed Johnson, saying "fuck homey, back off or

14

something to that effect . . . ." Up to that point, Rawlings did not observe a need to call for a scan because he "didn't see a physical threat at that time." When questioned about his use of the word "escort," Rawlings explained he saw Johnson "open handed kinda push[] [minor] on the shoulders" and it "appeared" as if he might have done it again. However, Rawlings admitted he could only say that he saw one push. Rawlings did not call a scan because there was no struggle or fight and the situation was not escalating.

Based on the record before this court, we agree with the arbitrator's observation that Rawlings's honesty during the investigation "undercut . . . the conclusion that he intended to deceive." (Fn. omitted.) Rawlings genuinely believed the situation did not warrant a scan call until he observed Johnson restraining A.S. on the bed. "Honesty is not considered an isolated or transient behavioral act; it is more of a continuing trait of character." (*Gee v. California State Personnel Board*, *supra*, 5 Cal.App.3d at p. 719.) These words are apt in this case. We reject the County's claim that Rawlings falsified his incident report or that he was dishonest during the investigation. Rather, we conclude Rawlings's honesty was profound. He did not try to conceal Johnson's actions. He did not deny that he witnessed a push. And his explanations for his choice of words and the contents of his incident report were reasonable. Under these circumstances, the arbitrator could reasonably conclude that Rawlings's misconduct warranted a strict penalty, but that the penalty of dismissal was too harsh considering the factors in mitigation.

### 2. *Careless and Negligent*

The County agrees with the arbitrator's holding that Rawlings was careless and negligent; however, it contends the arbitrator abused its discretion in failing to uphold

15

Rawlings's termination on this basis alone, especially since he imposed a 22-month unpaid suspension.  We disagree.

The County's sole argument in support of its claim is as follows:  "Under the well-established authority on labor arbitration, *How Arbitration Works*, which was cited by the Arbitrator, serious offen[s]es 'usually justify summary discharge without the necessity of warnings or attempts at corrective discipline.['] [Citation.]  Under this analysis alone, the Arbitrator should have found Rawlings was terminated for just cause."  However, according to the Memorandum of Understanding between the County of Riverside and Riverside Sheriff's Association Public Safety Unit (MOU), the arbitrator is vested with the discretion to review and change the discipline imposed by the County based on the evidence presented.  Article XII, section 8.I.4. of the MOU provides:  "In the case of *discharges*, *if the arbitrator finds the order of discharge should be modified*, the appellant shall be reinstated to a position in the classification held immediately prior to discharge subject to forfeiture of pay and fringe benefits for any period of suspension imposed by the arbitrator."  Pursuant to this language, it was well within the arbitrator's discretion to conclude that a 22-month unpaid suspension was more appropriate than the termination of Rawlings's employment, and was sufficient to alert him to the seriousness of his conduct, such that it would not recur.

## C.  Propriety of Discipline Imposed

The County contends the arbitrator inappropriately substituted his discretion for that of the County concerning the degree of punishment imposed on Rawlings. Repeating its reasons for terminating Rawlings, i.e., his dishonesty, the County argues

16

that (1) the arbitrator's imposition of a 22-month suspension exceeded the maximum time the County could have legally imposed, (2) the arbitrator's imposed suspension rests on his opinion which is inherently contradictory, and (3) the holding in *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716 (*Kolender*) applies in this case.

As we previously noted, the arbitrator is empowered with the discretion to modify Rawlings's order of discharge. (MOU Art. XII, § 8.I.4.) The fact that the arbitrator may have agreed that Rawlings's actions constituted a "serious breach of departmental policy" does not mean the arbitrator was required to affirm the termination. Although the County relies on *Kolender* to support its argument, we find the case to be distinguishable. In *Kolender*, Sheriff's Deputy Timothy Earl Berry was discharged for lying to cover up Deputy Alfonso Padilla's physical abuse of an inmate, but the Civil Service Commission reduced Deputy Berry's penalty to a 90-day suspension. (*Kolender*, *supra*, 132 Cal.App.4th at pp. 719-720.) Overturning the civil service commission's decision, the Court of Appeal explained: "'An abuse of discretion occurs where, as here, the administrative decision manifests an indifference to public safety and welfare. "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the

17

government at risk of incurring liability.' [Citation.] Accordingly, this is not a case where reasonable minds can differ with regard to the appropriate disciplinary action. [Citation.]" (*Id.* at p. 721.) As the court noted, "The safety and physical integrity of inmates is one of the office's paramount responsibilities." (*Id.* at p. 722.)

The facts in this case differ significantly from the facts in *Kolender*. Unlike the inmate in *Kolender* whose physical abuse was covered up by Deputy Berry, A.S. was not physically abused to the point that he needed medical care. Moreover, Rawlings's inaccurate or incomplete report of the incident was starkly different than Deputy Berry's dishonesty and interference with the internal investigations. In *Kolender*, Deputy Berry lied about the incident at Deputy Padilla's request. One week later, when Deputy Berry was confronted by an investigator about the truth of his account of Deputy Padilla's action, Deputy Berry continued to lie. Only when the investigator told Deputy Berry he was not being honest did Berry admit that he had lied to protect Deputy Padilla. (*Kolender*, *supra*, 132 Cal.App.4th at p. 719.) Here, the evidence supports the arbitrator's finding that Rawlings was not intentionally deceitful. Rawlings did not attempt to cover up Johnson's misconduct either in his incident report or during his interview by investigators. In the arbitrator's view, Rawlings simply failed to understand he should have used the word "push" instead of "escort."

More importantly, contrary to the County's assumption, *Kolender* does not compel discharge from employment as a penalty for dishonesty in every circumstance. "Termination is the most extreme penalty that can be imposed in the employment context, depriving the employee of the means of livelihood and making it more difficult

18

to find other employment because of the questionable circumstances under which the prior job ended. [Citation.] By contrast, a suspension does not destroy but merely interrupts employment. [Citation.]" (*Paoli v. Civil Service Com.* (1993) 12 Cal.App.4th 1073, 1077.) While we recognize that termination is an acceptable penalty for dishonesty by a public employee (*Kolender*, *supra*, 132 Cal.App.4th at p. 721), it does not follow that dismissal is required in all cases of dishonesty. (*Catricala v. State Personnel Bd.* (1974) 43 Cal.App.3d 642, 644-648 & fn. 2.) And here, Rawlings was found not to be dishonest but mostly to have unintentionally erred in reported the incident.

To be sure, similar misconduct in the future may well place Rawlings's employment in jeopardy. However, based on the facts of his misconduct presented in this case, we cannot say that the arbitrator acted arbitrarily, capriciously, or beyond the bounds of reason in reducing the penalty from termination to a time served suspension of 22 months without pay.

## III. DISPOSITION

The judgment is affirmed. Rawlings shall recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

      HOLLENHORST

                 J.

We concur:

   RAMIREZ

          P.J.

   MILLER

        J.